UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

MULCH MANUFACTURING INC.,

     Plaintiff,

                            Case No. 2:11-CV-00325
     v.                        JUDGE EDMUND A. SARGUS, JR.
                            Magistrate Judge Terence P. Kemp

ADVANCED POLYMER SOLUTIONS,
LLC, *et al.*,

     Defendants.

## OPINION AND ORDER

Plaintiff, Mulch Manufacturing Inc. ("MMI"), brings this diversity action against

Defendants, Advanced Polymer Solutions, LLC ("APS"), and John M. Ryan ("Ryan")

(collectively "Defendants"), for various claims including breach of contract and fraud. This

matter is before the Court for consideration of APS's Motion for Summary Judgment (ECF No.

46) and MMI's Motion for Partial Summary Judgment (ECF No. 47). For the following reasons,

APS's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. MMI's

Motion for Partial Summary Judgment is **DENIED**.

## I. BACKGROUND

A.    **Relevant Facts**

    1.    **The Parties**

MMI is an Ohio corporation, with its headquarters located in Reynoldsburg, Ohio. (J.

Spencer Decl. ¶ 2, ECF No. 17-1.) MMI manufactures, sells, and distributes mulch and mulch-

related products. (J. Spencer Dep. 7, ECF No. 35-2.) In addition, to its Ohio location, MMI has

a plant located in Callahan, Florida. (J. Spencer Decl. ¶ 2, ECF No. 17-1.) Josh Spencer ("J.

Spencer") is the CEO of MMI, and his son, Ralph Spencer ("R. Spencer") is the company's

President. (J. Spencer Dep. 6; R. Spencer Dep. 4, ECF No. 35-3.) J. Spencer's office and MMI's

accounting office are located in Ohio. (J. Spencer Decl. ¶ 2, ECF No. 17-1.) Jonathon Stott

("Stott") was a production and sales employee of MMI during the relevant periods of this

lawsuit. (Stout Dep. 6, ECF No. 35-7.) Wayne Jones ("Jones") is a General Manager for MMI.

(Jones Dep. 6, ECF No. 35–5.)

APS is a limited liability company located in Port Washington, Long Island, New York.

(Ryan Aff. ¶ 5, ECF No. 13-1.) APS "custom tailor[s]" chemical formulations and also

manufactures products. (Ryan Dep. 10, ECF No. 35-1.) APS uses a patented process, which it

refers to as "grafting," to chemically bond properties to a customers' product, resulting in "[a]

better adhesion." (*Id.* at 11–12.) Defendant Ryan, who is a resident of New York, is the

President of APS. (*Id.* at 8–9.) Paul Thottathil, Ph.D. ("Dr. Thottathil"), is APS's Vice President

of Research and Development. (Thottahil Dep. 7, ECF No. 35-4.)

### 2. The Agreement

In 2005, MMI began manufacturing a product called "Softscape," a mulch product made

from shredded fiber. (J. Spencer Dep. 7–8, 17, 34.) MMI initially sold Softscape without a

flame retardant, until the company received several complaints from customers that Softscape

was catching on fire. (*Id.* at 17–19.) Accordingly, MMI began looking for a solution, such as a

fire retardant that could be added to the mulch. (*Id.* at 20.)

Shortly after it received complaints regarding Softscape, MMI reached out to APS to

learn if APS could formulate a fire retardant for Softscape. (*See* J. Spencer Dep. 20–21; Ryan

Dep. 15–16, 19–20; Stout Dep. 8.) R. Spencer stated that, during discussions with APS, MMI

stressed that it wanted APS to develop a formula so that MMI could choose between making the formula itself or having someone else make the formula. (R. Spencer Dep. 13.) Stout stated that during a meeting with APS employees, Ryan and Dr. Thottathil indicated that they were capable of developing a flame retardant that "would adhere to the fibers of the wood . . . ." (Stout Dep. 35–36.)

In June 2006, Ryan emailed Stott indicating that the results of a project feasibility assessment were "very encouraging" and estimating a price of 25 to 30 cents per pound. (Dep. Ex. 6.[1]) According to Stout, during this initial stage, APS employees indicated that they believed APS could fulfill price requirements that MMI had set. (Stott Dep. 36–37.) J. Spencer testified that, in negotiations building up to the contract, Ryan and he discussed MMI's various objectives, including that the formulation would prevent fires, adhere to the wood fibers, and be cost effective. (J. Spencer Dep. 26–27.)

On July 18, 2006, MMI and APS ultimately entered into an agreement (hereinafter the "R&D Agreement" or "Agreement") regarding the development of a formulation.[2] (Agreement, ECF No. 46-4.) The R&D Agreement specifically acknowledged that MMI was interested in a flame resistant property—"obviously improved over other items now on the market"—that it could graft to mulch. (Agreement I.) The R&D Agreement did not contain any express cost of the product APS would develop. (Agreement; *see also* R. Spencer Dep. 36.) The R&D

---

[1] On January 10, 2013, Defendants filed sixty-six exhibits that the parties used during the relevant depositions in this case. (*See* ECF No. 36.) The Court will cite to these exhibits as "Dep. Ex." These exhibits are attached to electronic docket entry thirty six.

[2] The parties have filed the Agreement within the record on numerous occasions. For the purposes of this Opinion and Order, the Court will cite to the document as "Agreement."

3

Agreement stated, however, that APS would develop the chemical combinations "according to [MMI's] submitted specifications." (Agreement IV.)

The R&D Agreement contained three general phases. (*See* Agreement II, IV.) The first phase—set to last four weeks—stated that "APS chemists will vary different combinations of activator, monomers and catalysts according to [MMI's] submitted specifications. At the end of this phase, APS will send [MMI] *preliminary* samples for testing and evaluation." (*Id.* at IV (emphasis in original).) MMI owed APS $30,000 for the first phase. (*Id.* at II.) At the end of this phase MMI had the right to terminate the R&D Agreement with no further fees. (*Id.*)

With regard to second phase, the R&D Agreement provided:

**Phase 2**: (4 weeks) Based on [MMI's] test results and feedback on Phase 1 samples, the formulation will be optimized. Again, at the end of this phase, samples will be sent to [MMI] for evaluation and testing. All technical data (including formulations), safety data sheets and a report will be sent to [MMI].

(*Id.* at IV (emphasis in original).) MMI agreed to pay APS $50,000 at the start of the second phase. (*Id.* at II.) The R&D Agreement also expressed APS's desire to manufacture the formulation for MMI on an ongoing basis either during or after the second phase. (Agreement IV.) R. Spencer stated that the parties removed language expressly requiring APS to manufacture any developed product. (R. Spencer Dep. 13.)

Finally, the R&D Agreement allowed MMI the option of a third phase, in which APS would fine tune a formulation, to the extent necessary, and transfer a patent application to MMI. (*Id.*) The Agreement provided that any resulting patents would belong to MMI. (*Id.* at III.) The Agreement further stated that MMI would owe APS an additional $40,000, upon transfer of a patent application, if MMI elected to patent the ultimate formulation. (*Id.* at II.)

4

### 3.    Product Development, Formation 48, and Spartan FR-48

On July 19, 2006, MMI paid APS $30,000 for the first phase of research and

development. (Ryan Dep. 37–38; Dep. Ex. 1.) APS worked from mulch samples that MMI sent.

(Thottathil Dep. 8.) Dr. Thottathil stated that during the first phase he made different

formulations and treated the mulch with the formulations. (*Id.* at 8–10.) J. Spencer testified that

during this general period MMI would periodically receive samples from APS of either fire

retardant or mulch treated with fire retardant. (J. Spencer Dep. 40–41.) J. Spencer stated that at

the end of the first phase MMI was satisfied that APS was making progress. (J. Spencer Dep.

39–40.) On August 15, 2006, MMI paid APS $50,000 for the second phase of the R&D

Agreement. (Dep. Ex. 1.)

On August 9, 2006, APS sent MMI mulch samples treated with four different

formulations—formulation numbers 28, 31, 33, and 34—for MMI's evaluation. (Thottathil Dep.

16; Dep. Ex. 9.) Of the formulations it received on August 9, 2006, MMI initially preferred

formulation 28. (*See* Thottathil Dep. 17.) On September 1, 2006, APS shipped MMI sixteen

drums of formulation 28 for trial. (Dep. Ex. 10.) MMI paid $11,900 for this shipment. (Dep.

Ex. 2, ECF No. 36-2.) J. Spencer stated that MMI was dissatisfied with formulation 28 because,

according to MMI, the formulation wouldn't mix with water. (J. Spencer 48–49; *see also* Jones

Dep. 13–14.) According to J. Spencer, MMI also felt that APS was ignoring parameters that

MMI had set, including cost. (J. Spencer Dep. 48–49; Dep. Ex. 11.)

Dr. Thottathil averred that, in response to MMI's criticism of formulation 28, APS began

making other formulations. (Thottathil Dep. 18.) Dr. Thottathil's testimony suggests that APS

eventually sent MMI a price quote for formulation number 48 ("formulation 48"). (*See id.* at

5

18–25.) Dr. Thottathil testified that formulation 48 was a multi-ingredient formulation. (*Id.* at 21.) Dr. Thottathil further described that one of the ingredients for formulation 48 was "FR-48," an additive material that Spartan Flame Retardants, Inc. ("Spartan") manufactured. (*Id.* at 19–21.) During his deposition testimony, Dr. Thottahil also referred to the Spartan material as "additive 48." (*See, e.g., id.* at 48.) According to Dr. Thottahil, the numbering of formulation 48 and FR-48 was coincidental. (*Id.* at 59–60.) Dr. Thottahil testified that FR-48 is an ammonium polyphosphate and that there are other companies, besides Spartan, that make ammonium polyphosphate. (*Id.* at 51–52, 66.)

J. Spencer stated that, in late October 2006, MMI was ready to use formulation 48 in production. (J. Spencer Dep. 91.) He asserted, however, that MMI still believed the price was too expensive. (*Id.* at 92.) J. Spencer further averred that APS and Ryan represented that "APS had developed this formulation in-house." (J. Spencer Decl. ¶ 6, ECF No. 17-1.) J. Spenser maintained that MMI's understanding at this time was that—even when it began using what it thought to be APS's formulation—APS was still working on creating a better formulation to meet MMI's requirements. (J. Spenser Dep. 80–81, 108–10, 137.) In other terms, J. Spencer stated that he believed that APS's research and development was proceeding parallel to MMI's purchase of the product. (*Id.* at 80–81.) Dr. Thottathil testified that, after October 2006, APS continued to research and develop to the extent that it looked for a binder that would prevent the flame retardant from washing out. (Thottathil Dep. 31, 40.) Dr. Thottathil asserted that he also spent at least some time searching for cheaper chemicals and running tests relating to the MMI formulation. (*Id.* at 39–40.)

### 4.    Purchase Orders

During the above period of development, MMI and APS exchanged a number of communications that ultimately led to several purchase orders spanning from October 2006 to May 2010.  Dr. Thottathil testified that after APS sent MMI a price quote for formulation 48, MMI informed APS that the formulation was too expensive.  (Thottathil Dep. 18–19.)  Dr. Thottathil stated that Ryan then instructed him to send MMI the best individual chemical from the formulation.  (*Id.* at 19.)  According to Dr. Thottathil, he sent MMI the Spartan FR-48 material for its evaluation.  (*Id.*)  Within a September 12, 2006 letter to J. Spencer,[3] Dr. Thottahil stated:

> We are sending you via UPS 15 gallons of additive #48 for your evaluation.  Please add all these three pails of flame retardant chemicals to one batch of your production (one load).  Please test it as soon as possible and let us know the results so that we can order more chemicals.

(Dep. Ex. 12.)

J. Spencer and Ryan exchanged a series of emails in September and October 2006.  The emails subject lines all stated that they were regarding "Formulation 48."  (Dep. Exs. 14–16.)  Within the initial September 26, 2006 email, Ryan stated that he was approaching his "suppliers" to try and lower costs and indicated that he had been able to bring the cost of the product down to 60 cents per pound.  (Dep. Ex. 16 at 7.)  J. Spencer responded indicating that this price was unacceptable.  (*Id.* at 6.)  Moreover, J. Spencer stated that MMI would need a tote of the fire

---

[3] Although Dr. Thottahil addressed the letter to J. Spencer—at MMI's Callahan, Florida location—both J. Spencer and R. Spencer testified that they had never seen the letter prior to this litigation.  (J. Spencer Dep. 52–53; R. Spencer Dep. 19–20.)  Jones also testified that he had never seen the letter before.  (Jones Dep. 15.)  With regard to the letters terms, Jones stated that it was his understanding that a formulation would be a recipe, and that an additive would be an addition to the recipe.  (Jones Dep. 15–16.)

retardant to test,[4] because MMI's tests of the initial sample "were not sufficient to determine the performance through [MMI's] production equipment." (*Id.* at 4.) In response, Ryan wrote that APS had obtained a tote of chemicals from its suppliers. (*Id.*) On September 28, 2006, within the same chain of emails, J. Spencer stated "[b]efore we precede any further [MMI] must receive a copy of the formulae from [APS] as provided in the contract . . . ." (*Id.*) Ryan responded that Dr. Thottathil would compile the formulation for MMI. (*Id.* at 1.)

J. Spencer's testimony reflects that MMI was eventually able to test the product APS sent and concluded that it worked. (J. Spencer Dep. 81.) J. Spencer also testified that, at the time of testing, MMI did not know how to develop the product and had not received any formulation. (*Id.*) Moreover, J. Spencer stated that MMI did not have the capability of testing the chemistry of (or reverse engineering) the product, and was instead examining whether mulch treated with a sample would burn. (*Id.* at 46–47, 142.) With regard to testing, Dr. Thottathil testified that he knew that a sample of FR-48 (additive 48) was sent to MMI, but that APS did not send—or at least he could not remember APS sending—MMI a sample of the actual formulation 48.[5] (Thottatil Dep. 24–26.)

In late October 2006, Ryan sent an email, once again with a subject line of "Formulation #48," reflecting that MMI had agreed to purchase 45,000 pounds of product. (Dep. Ex. 17.) A subsequent purchase order described the purchase as being for a "[f]ire [r]etardant product for colored mulch as previously discussed and agreed upon." (Dep. Ex. 18.) MMI continued to

---

[4] According to Ryan, a "tote" is a five drum quantity of product. (Ryan Dep. 102.)

[5] During his deposition, Ryan could not recall the circumstances surrounding what, if any, product APS provided MMI for testing following the email exchange in late September 2006. (*See* Ryan Dep. 102–04.)

8

submit purchase orders for the fire retardant until May 2010. (*See* Dep. Ex. 2.) The record reflects, and Defendants concede, that from October 2006 through May 2010, the product MMl was receiving from APS was the Spartan manufactured additive, FR-48, not formulation 48. (*See* Ryan Dep. 46–47, 110; Thottathil Dep. 29–30, 46; Dep. Ex. 3.)

According to J. Spencer, based on the representations of APS, MMI was under the impression that the fire retardant it was purchasing was the formulation that APS developed and was producing. (J. Spencer Dep. 79, 142–44; *see also* R. Spencer Dep. 25–26.) Ryan, on the other hand, asserted that MMI knew that they were being shipped a "bare bones formulation that was the FR-48." (Ryan Dep. 169.) Specifically, Ryan stated that MMI knew that APS could not manufacture products in the quantity that APS was shipping.[6] (*Id.* at 169–70.) Although he was vague as to a specific time or manner, Ryan generally averred that APS told MMI that the product was only FR-48 and that "[MMI] knew it was as cheap as [APS] could get it to them." (*Id.* at 129, 170.) Ryan also testified—without identifying a specific time frame—that APS sent MMI an ingredient list for formulation 48 that listed the suppliers of each chemical ingredient, including Spartan. (*Id.* at 127–28; Dep. Ex. 22.)

### 5.    Shipments of FR-48 and Continuing Relationship

In order to ship FR-48 to MMI, APS entered into a non-disclosure agreement with Spartan on October 26, 2006. (Dep. Ex. 21.) With regard to bills of lading and the shipment of products, the agreement between Spartan and APS stated:

> [APS] shall from time to time place orders with Spartan for the Product which
> Spartan shall ship to [APS's] customers at the locations to be designated by [APS],

---

[6] Ryan specifically stated that MMI knew APS "couldn't manufacture tanker cars." (Ryan Dep. 169.)

9

all of which such orders shall be shipped pursuant to bills of lading issued by [APS] directly to its customers. At no time shall any vehicle involved in the transport of such Product to a customer of [APS] or any container in which the Product is held, transported or delivered, bear any marking or identification of any kind or be accompanied by any documentation or labels which in any way indicates or reflects that the Product originated at Spartan or was distributed or manufactured by Spartan . . . .

(*Id.* at 1.) John Kuetemeyer, Spartan's President, averred that his understanding of the purpose for these requirements was that APS did not want MMI to know where the shipments were coming from. (Kuetemeyer Dep. 32–32, ECF No. 35-6.) Ryan stated that he considered requiring a blind bill of lading to be standard procedure. (Ryan Dep. 170.) Additionally, in early 2007, after the initial shipment of FR-48, Jones testified that APS sent MMI a Material Safety Data Sheet ("MSDS") concerning the product.[7] (Jones Dep. 36–38.) The MSDS listed "Formulation #48" as the identity of the product in question and provided that APS was the manufacturer. (Jones Dep. Ex. 68, ECF No. 44-1.)

The parties continued to exchange communications during the period when MMI was placing purchase orders with APS. In December 2006, within an email to J. Spencer regarding purchase orders, Ryan stated that APS would "be shutting down production for [the] Christmas week. Please advise if another order is needed beforehand . . . ." (Dep. Ex. 27.) On January 25, 2007, Ryan again emailed J. Spencer stating "[w]e have not received an order from you since last Oct[ober]. When we discussed this manufacture, you mentioned quite a volume." (Dep. Ex. 28.) In April 2007, during a series of emails to J. Spencer regarding the ordering of fireproofing, Ryan

---

[7] "A material safety data sheet details the health effects of a hazardous chemical, provides the signs and symptoms of exposure, and lists any medical conditions generally known to be aggravated by exposure to the chemical." *LidoChem, Inc. v. Stoller Enter., Inc.*, 500 F. App'x 373, 375 n.1 (6th Cir. 2012).

stated that "[u]pon confirmation of transfer, the formulation will be manufactured and shipped to [MMI's] facilities." (Dep. Ex. 30.)

J. Spencer states that, in January 2008, MMI began purchasing a binder—in addition to the fire retardant—to prevent the fire retardant from washing off the mulch in rain. (J. Spencer Dep. 131–33.) Dr. Thottathil stated that this product was Haloflex 202 and that APS ordered the binder from Monson Industries ("Monson"). (Thottathil Dep. 11.) The initial purchase order for the binder, dated January 8, 2008, described the product as "Formulation #48 Binder." (Dep. Ex. 2 at 9.)

In September 2009, R. Spencer emailed Ryan. (R. Spencer Dep. 27; Dep. Ex. 36.) At this time, R. Spenser informed Ryan that—due to concerns about the cost of the flame retardant—MMI hired a chemist, Rick Starcher ("Starcher"), to evaluate the potential of lowering costs. (Dep. Ex. 36.) Within the email, R. Spencer further provided:

> I have given [Starcher] your email address and phone number and he will be contacting you to ask questions about the formula for the products [sic] you are selling us. We would ask you to give Rick the formula and cooperate with him in an effort to solve our problems. Our contract with you indicates that we own the formula so you should not have a problem with this. . . .

(*Id.*) Ryan responded to this email stating that if MMI could submit a blanket purchase order for the retardant and binder, he would be able to work with APS's raw material supplier to lower prices. (Dep. Ex. 37.)

With regard to the formula, Ryan emailed Starcher and referred him to Stott, stating that it was his understanding that APS had already sent the formula to MMI "a long time ago." (Ryan Dep. 176–77; Dep. Ex. 38.) On October 1, 2009, based upon Starcher's continued request, Ryan emailed Starcher a formula. (Ryan Dep. 177–78; Dep. Ex. 39.) This formula was "for the

11

chemically-grafted compound that was too expensive[,]" formulation 48, not Spartan FR-48. (Ryan Dep. 178.)  In additional email exchanges between Starcher and R. Spencer, Ryan stated that APS would not divulge APS's raw material suppliers. (Dep. Exs. 40, 42.) Ryan represented that APS "would like to continue to supply [MMI] with this formulation as a compounder." (Dep. Ex. 42.) Ryan also stated that generally APS's clients "tend[] to feel more comfortable having the company that formulated [the product] also compound it." (*Id.*)  Finally, on November 3, 2009, in an email to Starcher concerning suppliers, Ryan stated, "[y]ou will not find a better price, I assure you." (Dep. Ex. 43.)

### 6.    MMI and APS's Relationship Ends

According to R. Spencer, MMI first discovered that APS was selling MMI a Spartan product when MMI accidently received a document in May 2010 referencing Spartan. (*See* R. Spencer Dep. 64– 65; R. Spencer Dep. Ex. 67, ECF No. 43-1.)  R. Spencer stated that this course of events led MMI to discover that APS had been selling FR-48, and not formulation 48. (R. Spencer Dep. 66–67.)  R. Spencer asserted that when he contacted Ryan concerning the matter, Ryan represented that APS was supplying Spartan with raw materials and Spartan was mixing the materials. (*Id.* at 67–68.)  R. Spencer stated that he thought, at the time, that attempting to deal directly with Spartan " would be a worthless venture" because the Spartan representative became "quiet with [him]" when he contacted the company. (*Id.* at 70.)  J. Spencer averred that MMI stopped using the product that APS sold them in 2010 and began manufacturing its own flame retardant, different from the formulation APS provided. (J. Spencer Dep. 152.)

During his deposition, J. Spencer testified that over the course of the companies' relationship, MMI paid APS $722,000.00 for product purchases. (J. Spencer Dep. 148, Dep. Ex.

64.) Within a later declaration, J. Spencer averred that—by his calculations—APS made a profit of approximately $185,000 by marking up the cost of the Spartan product and selling it to MMI.[8] (J. Spencer Decl. ¶ 2, ECF No. 47-1.) According to J. Spencer, MMI always used the FR-48 flame retardant in its Softscape product from October 2006 until it stopped purchasing with APS in 2010. (J. Spencer Dep. 168.)

**B.   Procedural History**

MMI brought this action in April 2011.[9] Within its Complaint, MMI brings claims against APS for fraud; violation of the Ohio Deceptive Trade Practices Act ("ODTPA"), Ohio Revised Code § 4165.01 *et seq*.; breach of contract; breach of fiduciary duty; and negligent misrepresentation. MMI also brings its claims, with the exception of breach of contract, against Ryan individually.

This matter is before the Court on the parties' cross Motions for Summary Judgment. APS and Ryan seek judgment as to all of Plaintiff's claims, while MMI requests summary judgment on its claims for fraud, violation of the ODTPA, and breach of contract. The parties view the above factual circumstances quite differently. APS maintains that it expressly informed MMI that it was providing MMI a sample of an additive for testing, referencing its supplier; MMI was able to test the additive to determine that it worked; and MMI used the additive in its Softscape product—and the additive worked—over a four-year period. MMI, on the other hand,

---

[8] Although not determinative of the current dispute, there is some discrepancy between the figures J Spencer referenced during his deposition and declaration. (*Compare* Dep. Ex. 64; *with* J. Spencer Decl. Ex. A, , ECF No. 47-1.)

[9] In April 2012, APS filed a Counterclaim against MMI alleging breach of the patent phase of the Agreement. APS stipulated to voluntary dismissal of this Counterclaim in January 2013. (ECF No. 27.)

contends that APS mislead MMI into believing that it was purchasing a unique formulation, that it had paid APS to develop, rather than a third-party product that APS marked up as a distributor.

## II. STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (internal quotations omitted). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby, Inc.*, 477 U.S. at 248; s*ee also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the requirement that a dispute be "genuine" means that there must be

14

more than "some metaphysical doubt as to the material facts"). Consequently, the central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby, Inc.*, 477 U.S. at 251–52.

## III. ANALYSIS

The Court first considers the parties choice of law contentions as well as potential application of the economic loss rule. The Court will then address the claims independently, examining whether any party is entitled to judgment. Finally, the Court will consider the parties' separate contentions regarding individual liability against Ryan.

### A. Preliminary Matters

#### 1. Choice of Law

Initially, the Court must address choice of law. There is some dispute as to whether Ohio law or New York law should apply to this action. MMI contends that the Court should apply Ohio law. Although Defendants maintain that New York law is proper, they also contend that "a conflict of laws analysis is largely unnecessary" given the similarity of the State's standards. (Defs.' Mot. Summ. J. 17 n.9, ECF No. 46-1.) Defendants do maintain, however, that Plaintiff's claim for violations of the ODTPA should automatically fail because Ohio law does not apply to this case.

A federal court sitting in diversity applies the choice-of-law rules of the forum state. *Pedicini v. Life Ins. Co. of Alabama*, 682 F.3d 522, 526 (6th Cir. 2012). "Ohio's choice-of-law rules are the rules in the Second Restatement of Conflict of Laws." *EnQuip Technologies Group v. Tycon Technoglass*, — N. E.2d —, 2012 WL 6737839, at *10 (Ohio Ct. App. Dec. 28, 2012).

15

Initially, the Court must decide whether "the cause of action sounds in contract or in tort[,]" as different choice-of-law rules apply in each area. *Nicula v. Nicula*, No. 84049, 2009 WL 1244170, at *6 (Ohio Ct. App. May 7, 2009). Although claims under the ODTPA do not fit neatly into either category, as the title of the Act suggests, such claims are based on deceptive and misleading practices, akin to negligent misrepresentation or fraud. Consequently, the Court will apply tort choice-of-law principles. *See Laserworks, a Div. of King-Haller Enter., Inc. v. Pitney Bowes, Inc.*, 105 F. App'x 657, 661 (6th Cir. 2004) (treating case that included claims under the ODPTA as involving alleged tortious conduct for the purposes of an Ohio choice of law analysis).

Within the context of tort actions, to determine the state with the most significant relationship to the cause of action, Ohio courts consider "(1) the place of the injury; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; [and] (4) the place where the relationship between the parties, if any, is located . . . ." *Nicola*, 2009 WL 1244170, at *6. For claims of fraud, the Court must also consider:

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
>
> (b) the place where the plaintiff received the representations,
>
> (c) the place where the defendant made the representations,
>
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
>
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

(f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

*In re Nat'l Century Fin. Enter., Inc., Inv. Litig.*, — F. Supp.2d —, 2012 WL 5334027, at *17

(S.D. Ohio Oct. 26, 2012) (quoting Restatement (Second) Conflict of Laws § 148(2)).

MMI's claims in this action, including its claim under the ODTPA, relate to conduct in a number of states. Although MMI conducts some of its operations in Florida, both its headquarters and its CEO—J. Spencer—are located in Ohio. (Spencer Decl. ¶ 2, ECF No. 17-1.) J. Spencer asserted that during negotiations leading to the relevant purchase orders he exchanged information with APS, through telephone calls and emails, and ultimately issued the initial October 24, 2006 purchase order, from Ohio. (*Id.* at ¶ 7.) Spencer also averred that, with regard to the purchase order, MMI made all of its payments from Ohio. (*Id.* at ¶ 9.) On the other hand, both APS and Ryan are located in New York. (Ryan Dec. ¶¶ 2, 5.) Moreover, according to Ryan, negotiations for the initial R&D Agreement occurred between Florida and New York, and APS performed all of its research and development work in New York. (*Id.* at ¶¶ 18, 20.) Stout, an MMI employee, also visited APS's operation in New York during negotiations. (Stout Dep. 35.) Finally, the products were shipped from Spartan, located in Illinois, to MMI's Florida location. (*See* Dep. Ex. 62.)

The Court finds that Ohio law applies for the purpose of MMI's claims under the ODTPA. The actions giving rise to the ODTPA claim share a closer relationship to Ohio than New York. MMI's claim is based on the various alleged representations that APS and Ryan made regarding the product MMI was purchasing. While MMI alleges that Defendants misrepresented the product in a variety of ways, a large portion of the alleged misrepresentations

17

took place in email exchanges between J. Spencer and Ryan leading up to the initial purchase order. The record reflects that Ryan made these representations in New York and J. Spencer received these representations in Ohio. Tipping the scales in Ohio's favor, however, are the factors of reliance and injury. Specifically, the current record reflects that MMI—through J. Spencer—ultimately decided to make purchase orders, and paid for those purchase, from Ohio. Consequently, the Court finds that Ohio has a stronger relationship to MMI's alleged reliance and injury. *Cf.* Restatement (Second) Conflict of Laws § 148, cmt. c ("When plaintiff's initial act of reliance is his entry into a contract by which he binds himself to relinquish assets, the place of loss may be considered to be either the place where the plaintiff entered into the contract or the place where he relinquished the assets pursuant to the terms of the contract . . . .").

With regard to the remainder of the claims, the Court finds it unnecessary to perform a choice of law analysis. Under Ohio law, "if two jurisdictions apply the same law, or would reach the same result applying their respective laws, a choice of law determination is unnecessary because there is no conflict, and the laws of the forum state apply." *Wendy's Intern., Inc. v. Illinois Union Insur. Co.*, No. 2:05-cv-803, 2007 WL 710242, at *5 (S.D. Ohio Mar. 6, 2007); *see also Glidden Co. v. Lumbermens Mut. Cas. Co.*, 112 Ohio St.3d 470, 474–75 (Ohio 2006) (holding that "an actual conflict between Ohio law and the law of another jurisdiction must exist for a choice-of-law analysis to be undertaken"). Moreover, the party seeking application of foreign law "bears the burden of showing that the foreign law is different from the local law: [w]here the party seeking application of the law of a foreign jurisdiction fails to demonstrate a conflict between local law and the law of that jurisdiction, local law . . . governs." *Wendy's Intern.*, 2007 WL 710242, at *5 (internal quotations omitted); *cf. also Asp v. Toshiba Am.*

18

*Consumer Prods., LLC*, 616 F. Supp.2d 721, 726 (S.D. Ohio 2008) ("When parties acquiesce to the application of a particular state's law, courts need not address choice of law questions.").

Here, Defendants concede that a choice of law analysis is largely unnecessary as to all but the ODPTA claims. (Defs.' Mot. Summ. J. 17 n.9.) Under these circumstances, the Court finds any further choice of law analysis unnecessary, and will presume—at least for the purposes of summary judgment—that Ohio law applies to the remaining claims.

### 2. Economic Loss Rule

Defendants also maintain that the economic loss doctrine bars MMI's claims for fraud, deceptive trade practices in violation of the ODTPA, breach of fiduciary duty, and negligent misrepresentation.[10] MMI asserts that these causes of action fall within exceptions to the economic loss rule.

In 2005, the Ohio Supreme Court provided the following outline of the economic loss rule:

> The economic-loss rule generally prevents recovery in tort of damages for purely economic loss. *See Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.* (1989), 42 Ohio St.3d 40, 45, 537 N.E.2d 624; *Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.* (1990), 54 Ohio St.3d 1, 3, 560 N.E.2d 206. " '[T]he well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable.' " *Chemtrol*, 42 Ohio St.3d at 44, 537 N.E.2d 624, quoting *Nebraska Innkeepers, Inc. v. Pittsburgh–Des Moines Corp.* (Iowa 1984), 345 N.W.2d 124, 126. *See, also, Floor Craft*, 54 Ohio St.3d at 3, 560 N.E.2d 206. This rule stems from the recognition of a balance between tort law, designed to redress losses suffered by breach of a duty imposed by law to protect societal interests, and contract law, which holds that "parties to a commercial transaction should remain

---

[10] Although MMI labels its fifth claim as simply "negligence," both the factual pleadings and briefing make clear that MMI is proceeding on a negligent misrepresentation theory. To the extent MMI is attempting to proceed on a standard negligence claim, such a claim would be barred under the economic loss doctrine.

free to govern their own affairs." *Chemtrol*, 42 Ohio St.3d at 42, 537 N.E.2d 624. *See, also, Floor Craft*, 54 Ohio St.3d at 7, 560 N.E.2d 206, quoting *Sensenbrenner v. Rust, Orling & Neale Architects, Inc.* (1988), 236 Va. 419, 425, 374 S.E.2d 55. " 'Tort law is not designed * * * to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. That type of compensation necessitates an analysis of the damages which were within the contemplation of the parties when framing their agreement. It remains the particular province of the law of contracts.' " *Floor Craft*, 54 Ohio St.3d at 7, 560 N.E.2d 206, quoting *Sensenbrenner*, 236 Va. at 425, 374 S.E.2d 55.

*Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 106 Ohio St.3d 412, 414 (Ohio 2005). In other terms, "where a plaintiff has suffered only economic harm as a result of a defendant's breach of duty, the economic-loss rule will bar the tort claim if the duty arose only by contract." *Campbell v. Krupp*, 195 Ohio App.3d 573, 580 (Ohio Ct. App. 2011).

The issue of how far the economic loss rule extends is somewhat unsettled under Ohio law. *See ITS Fin., LLC v. Advent Fin. Servs., LLC*, 823 F. Supp. 2d 772, 783 (S.D. Ohio 2011) (noting confusion, in light of *Corporex*, as to the extent the doctrine applies outside of simple negligence actions). The general approach, however, is that "the economic-loss rule does not apply—and the plaintiff who suffered only economic damages can proceed in tort—if the defendant breached a duty that did not arise solely from a contract." *Campbell*, 195 Ohio App.3d at 580; *see also Cleveland v. JP Morgan Chase Bank, N.A.*, No. 98656, 2013 WL 1183332, at *7–8 (Ohio Ct. App. Mar. 21, 2013) (holding that the economic loss rule did not apply "where the duty alleged to have been breached is not related to a contractual relationship"). Moreover, various courts, applying Ohio law, have held that the economic loss rule does not apply to the claims involved here. *See, e.g., MedChoice Fin., LLC v. ADS Alliance Data Sys., Inc.*, 857 F. Supp.2d 665, 680 (S.D. Ohio 2012) (holding economic loss rule did not bar claim under the ODTPA); *Hodell-Natco Indus., Inc. v. SAP Am., Inc.*, No. 1:08 CV 02755, 2011 WL 2174365, at

20

*7 (N.D. Ohio June 2, 2011) ("Because the claims of fraud and fraudulent inducement relate to a duty that arises outside of the formation of a contract the economic loss rule should not apply."); *Nat'l Mulch & Seed, Inc. v. Rexius Forest By-Prod. Inc.*, No. 2:02-cv-1288, 2007 WL 894833, at *9 (S.D. Ohio Mar. 22, 2007) (holding, after a detailed examination of the economic loss rule, that the economic loss rule did not apply to a claim of negligent representation).

Based upon the above authority, and considering the specific circumstances of this case, the Court finds that the economic loss rule does not apply to MMI's non-contractual claims. MMI's various tort claims, and the alleged damages from such claims, share a common factual background with MMI's breach of contract claims. Nevertheless, the claims arise from separate duties. Specifically, MMI's non-contractual claims are all based upon Defendants' duties—independent from any contractual obligation in this case—not to engage in deceptive, misleading, and/or fraudulent practices in the course of their business relationships.

**B.      Breach of Contracts**

Moving to MMI's substantive claims, the Court begins by examining whether any party is entitled to summary judgment on the breach of contract claims. As both sides recognize, MMI's breach of contract claims require two inquiries. First, the Court must address whether APS breached the R&D Agreement. Second, the parties dispute whether APS breached the series of purchase orders spanning from October 2006 to May 2010.

21

### 1.    Applicable Law

Under Ohio law, "the elements for a breach of contract are that a plaintiff must demonstrate by a preponderance of the evidence that (1) a contract existed, (2) the plaintiff fulfilled his obligations, (3) the defendant failed to fulfill his obligations, and (4) damages resulted from this failure." *Anzalaco v. Graber*, 970 N.E.2d 1143, 1148 (Ohio Ct. App. 2012). In interpreting contractual language, the Court's purpose "is to ascertain and give effect to the intent of the parties." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361 (Ohio 1997). The Court generally presumes that the intent of the parties rests within the language of the contract. *Id.* "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Id.* (internal quotations omitted).

"[T]he interpretation of written contract terms, including the determination of whether those terms are ambiguous, is a matter of law for initial determination by the court." *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 763 (6th Cir. 2008) (applying Ohio law). "[I]n cases where ambiguity exists, interpretation of the parties' intent is a question to be determined by the trier of fact." *Schafer v. Soderberg & Schafer*, 196 Ohio App.3d 458, 477 (Ohio Ct. App. 2011) (internal quotations omitted); *see also PNC Bank, N.A. v. May*, No. 98071, 2012 WL 4243807, at *2 (Ohio Ct. App. Sept. 20, 2012) ("If . . . the contract is ambiguous, ascertaining the parties' intent constitutes a question of fact that may require the consideration of parol evidence.").

"Contractual language is ambiguous only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable

22

interpretations." *Covington v. Lucia*, 151 Ohio App.3d 409, 414 (Ohio Ct. App. 2003) (internal quotations omitted). "[W]here a contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent."[11] *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 219 (Ohio 2003). "Such extrinsic evidence may include (1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement." *Covington*, 151 Ohio App. 3d at 414. Although the resolution of any ambiguity is a question of fact, if extrinsic evidence reveals only one reasonable interpretation, the Court may enter summary judgment. *Comtide Holdings, LLC v. Booth Creek Mgmt. Corp.*, No. 07–CV–01190, 2011 WL 5520954, at *5 (S.D. Ohio Nov. 14, 2011) (applying Ohio law).

Relatedly, interpretation of a contract may require consideration of whether the contract is fully or partially integrated. "A contract is fully integrated when both parties to the contract adopt it as a final and complete statement of the terms of their agreement." *Miller v. Lindsay-Green, Inc.*, No. 04AP-848, 2005 WL 3220215, at *9 (Ohio Ct. App. Dec. 1, 2005). On the other hand, "[a] contract is partially integrated when the parties to the contract adopt it as a final expression of only one portion of a larger agreement, making the contract incomplete." *Id.* "[I]f a contract is not fully integrated, parol evidence of additional contract terms may be admitted to complete the agreement, but only to the extent that the additional terms do not contradict the written terms of the agreement." *Id.* (internal quotations omitted). "The question of partial integration must be determined from the *four corners of the document itself* . . . ."

---

[11] The Court, however, may not use extrinsic evidence "to alter a lawful contract by imputing an intent contrary to that expressed by the parties." *Westfield Ins. Co. v. Galatis*, 100 Ohio St. 3d 216, 219 (Ohio 2003).

*Allied Erecting & Dismantiling Co., Inc. v. Ohio Edison Co.*, No. 10–MA–25, 2011 WL
2138975, at *5 (Ohio Ct. App. May 26, 2011) (emphasis in original, internal quotations omitted).

### 2.    The Research and Development Agreement

As detailed above, the terms of the parties' July 2006 Agreement set forth two relevant
phases for research and development.  During the first four-week phase APS was to research and
develop different chemical combinations "according to [MMI's] submitted specifications" and
then provide MMI preliminary samples.  (Agreement IV.)  At the second phase, also stated to last
four weeks, the Agreement required APS to optimize the formulation and send the ultimate
formulation(s) to MMI.  (*Id.* at IV.)

Upon the face of the Agreement, the Court finds both (1) that the Agreement is only
partially integrated and (2) that some of its terms are ambiguous.  With regard to integration, the
Agreement is concise in setting forth the parties' terms, lacks a detailed description of the
parties' obligations, and contains no integration clause.  Moreover, the Agreement stated that
APS's development was subject to "submitted specifications[,]" which it did not define.  (*Id.*)
Along similar lines, the Court cannot determine the precise meaning of the reference to
specifications from the terms of the Agreement, and, therefore, such terms are ambiguous.
Accordingly, the parties' intent regarding such terms is an issue of fact and the Court may
consider outside evidence for the purposes of interpretation.

Based on the record evidence, the Court finds that a reasonable jury could find for MMI,
with regard to both phases, on its breach of contract claim.[12]  Specifically, the trier of fact could

---

[12]  The parties do not disagree that the July 2006 Agreement constituted an enforceable
contract.  Moreover, the fact that MMI met its payment obligation is undisputed.  Finally,
presuming that APS failed to meet its performance obligation, because MMI paid in full, a

reasonably conclude that MMI did not receive the level of research and development that it bargained for. Once again, the Agreement reflects that APS's task was to research and develop a formulation according to MMI's specifications. The testimony of both J. Spencer and Stout indicates that APS knew that a part of MMI's requirements for the formulation was cost effectiveness. (*See* J. Spencer Dep. 26–27; Stott Dep. 36–37.) Moreover, APS's June 2006 feasibility report addressed several factors, including cost, estimating a price of 25 to 30 cents per pound. (Dep. Ex. 6.) Much of the record evidence, however, indicates that none of APS's formulation—at any stage of development—ever came close to this cost estimate. (*See, e.g.*, Dep. Ex. 16 at 2–3, 6; J. Spencer Dep. 48–49.) Such circumstances, viewed in MMI's favor, allow for a reasonable inference that APS ignored—or at least failed to give sufficient weight to—MMI's specifications in performing its development of formulations.[13]

The Court finds Defendants contentions in support of summary judgment on the breach of contract claim unpersuasive. First, with regard to the first phase of the Agreement, Defendants stress that MMI's decision to continue to the second phase—despite an opt-out provision within the Agreement—demonstrates that APS met its initial obligation. This evidence, however, is not

---

reasonable jury could infer at least some level of damages. Accordingly, the central issue is whether a dispute of fact remains as to whether APS fulfilled its obligations under the Agreement.

[13] The record also suggests that APS agreed to continue researching, developing, and perfecting a formulation after the end of the initial four-week period of phase two. (*See* J. Spencer Dep. 80–81.) From the testimony of Dr. Thottahil, it is at least questionable whether, following late October 2006, APS performed any significant research into perfecting a formulation. (*See* Thottahil Dep. 31, 39–40.) MMI does not address whether any agreement to extend the initial research period is binding on APS. *See Costanzo v. Nationwide Mut. Ins. Co.*, 161 Ohio App. 3d 759, 769 (Ohio Ct. App. 2005) ("A modification to a contract is not binding unless supported by consideration."). Such a promise, however, could at the very least allow the trier of fact to infer that APS failed to develop a formulation meeting MMI's specifications.

conclusive under the circumstances of this case.  Although MMI's decision to proceed to phase

two might suggest that MMI was satisfied with the initial phase, construed in MMI's favor, such

evidence might only reflect that MMI—despite dissatisfaction with APS's initial

performance—was not yet willing to terminate the R&D Agreement.  Second, Defendants

maintain that APS satisfied phase two of the Agreement by providing MMI with the recipe for

formulation 48.[14]  Nevertheless, this contention fails to recognize that under the terms of the

Agreement it was not enough for APS to simply develop a formulation.  Rather, the Agreement

required APS to develop a formulation according to MMI's specifications.  (Agreement IV.)

Once again, much of the evidence within the record indicates that APS never, during either

phase, developed a formulation that approached its initial estimated price range.

At the same time, however, MMI fails to establish that it is entitled to summary judgment

for breach of the R&D Agreement.  Although APS's feasibility report appears to have been

overly optimistic, the ultimate Agreement was only for research and development of a

formulation, and neither the feasibility report nor the Agreement promised ultimate success.

From the current record evidence it is clear that APS ultimately created, tested, and provided

MMI with multiple formulations over the course of the Agreement.  Although the formulations

may not have met MMI's product requirements, a reasonable jury could infer that any such

failure was simply a result of the uncertain nature of research and development.  Under these

circumstances, an issue of fact remains as to whether APS failed to meet its obligations.

---

[14] The exact timing of when APS provided the recipe is unclear from the record.  The record reflects that Ryan provided the recipe to MMI in October 2009, approximately three years after the initial completion of phase two, following requests from Starcher.  (Dep. Ex. 39.)  Stout, however, testified that APS provided a formulation recipe before MMI went into full scale production.  (Stout Dep. 27–28.)

### 3.    The Purchase Orders

In addition to the Agreement, the parties entered into a series of purchase orders between October 2006 and May 2010.[15]  MMI maintains that APS breached these purchase orders by providing MMI FR-48, a third-party manufactured product, rather than formulation 48, a product that APS designed for MMI's specific purposes.  Defendants, on the other hand, assert that APS was under no obligation to manufacture the purchase order product and that MMI understood what product it was receiving.[16]

The central issue of contention is what product did the parties intend the purchase orders to cover.  If the purchase orders were for formulation 48, APS failed to satisfy the orders by sending FR-48.  If the purchase orders were for FR-48, APS met its obligation.  Like the terms of the R&D Agreement, the language of the purchase orders is ambiguous and only partially integrated.  The purchase orders contain only vague descriptions of the fire retardant product and clearly depend on previous discussions between the parties regarding the specific product involved.  (*See generally* Dep. Ex. 2.)  Accordingly, the parties intent is a question of fact and outside evidence is admissible.

Here, there remains a genuine dispute regarding the parties' contractual intent, making summary judgment for either MMI or Defendants inappropriate.  First, a reasonable jury could

---

[15] The purchase orders in dispute are those for the fire retardant, not the purchase orders for the binder that began in January 2008.

[16] Defendants also imply throughout their briefing that the purchase orders may not constitute enforceable contracts between the parties.  Nevertheless, Defendants fail to develop any line of argument to support this implication.  Moreover, the parties do not address whether the Ohio Uniform Commercial Code ("UCC"), as opposed to common law, applies to the purchase orders.  Based on the current briefing, however, there does not appear to be a material difference between application of the UCC or common law in this case.

conclude that the parties intended the purchase orders to be for formulation 48. After all, the purchase orders arose from the parties' previous research and development relationship, which resulted in the creation of formulation 48. Moreover, a number of communications between the parties allow for the inference that formulation 48 was the product the parties were contemplating. For example, a chain of emails between Ryan and J. Spencer from September 2006 to October 2006, which ultimately culminated in the initial purchase order, contained subject lines of "Formulation 48." (Dep. Ex. 16.) Although the language of these emails was imprecise as to the exact product at issue the emails often discussed a "formula" or "formulation."[17] (*Id.*) Moreover the MSDS sheet MMI received shortly after shipment of the first purchase order listed "Formulation #48" as the identity of the product in question. (Jones Dep. Ex. 68.) Combining these and other circumstances within the record, a reasonable trier of fact could certainly find that the purchase orders were for formulation 48.

On the other hand, a reasonable jury could also conclude from the evidence that the purchase orders were for the Spartan FR-48 product.[18] The record reflects that APS sent MMI

---

[17] Communications between the parties also referenced APS's "suppliers." (*See, e.g.*, Dep. Ex. 16.) At least for the purposes of summary judgment, such references cut in both directions. Such references are consistent with MMI's interpretation that APS was supplying it with a multi-ingredient formulation in which it had to obtain the ingredients from suppliers. Construed in APS's favor, however, such references may simply denote that APS had to obtain the product it was providing from a third-party manufacturer.

[18] There is also a third possibility that the parties do not expressly address. Specifically, from the current record it appears that a reasonable jury could find that there was a misunderstanding—given the similarity in product names—as to the subject of the purchase orders. Neither party specifically addresses the legal consequences of such a conclusion. *See, e.g.*, *United Steelworkers of America, AFL-CIO-CLC v. North Bend Terminal Co.*, 752 F.2d 256, 261 (6th Cir. 1985) (discussing, within the context of a collective bargaining agreement, possible solutions to mutual misunderstanding); *Int'l Broth. of Elec. Workers Local No. 683 Pension Trust v. Advantage Enter., Inc.*, 813 F. Supp. 592, 598 (S.D. Ohio 1993) (same); *cf. also*

samples of FR-48 for testing, and that MMI tested such samples and found that the product worked. (*See* J. Spencer Dep. 81.) In September 2006, Thottathil sent J. Spencer a letter indicating that the sample—presumably the initial sample of FR-48—was for "additive 48 . . . ."[19] (Dep. Ex. 12.) Within the letter, Dr. Thottathil stated that APS would need to "order more chemicals" if the results were positive. (*Id.*) Moreover, although his testimony was general, Ryan averred that he informed MMI that the product APS was shipping to MMI was FR-48. (Ryan Dep. 128–29, 170.) According to Ryan, MMI also understood, based on its knowledge of APS's capabilities, that APS could not manufacture products in the quantity that was being shipped. (*See* Ryan Dep. 169–70.) Taking the above evidence into consideration, and drawing inferences in APS's favor, a reasonable jury could conclude that MMI understood that the purchase orders were not for formulation 48 and that references to this formulation during the parties' communications were due to imprecise language choice.

A genuine dispute also exists as to what damages MMI experienced as a result of any potential breach of the purchase orders. Although Defendants may ultimately prove correct that MMI's actual damages do not equate to the gross amount of the FR-48 purchases, MMI still makes a sufficient showing of damages to survive summary judgment. The record indicates that MMI would have been able to purchase an ammonium polyphosphate comparable to FR-48 on the open market. (*See* Thottathil Dep. 51–52, 66.) Furthermore, it is clear that APS was selling

---

*Motorists Mut. Ins. Co. v. Columbus Fin., Inc.*, 168 Ohio App. 3d 691, 609–10 (Ohio Ct. App. 2006) (considering the doctrine of mutual mistake of fact). Currently, it is not necessary for the Court to address such a scenario. In particular, because the Court finds that a reasonable jury could favor either side's interpretation of events, summary judgment is inappropriate.

[19] Although the employees from MMI could remember receiving the letter at the time of their depositions, a reasonable jury could infer that the letter was both sent and received.

MMI the FR-48 at a marked-up rate.  (*Compare* Dep. Ex. 2; *with* Dep. Ex. 3.)  From these

circumstances, a reasonable jury could infer that MMI suffered damages.

**C.    Fraud**

Both MMI and Defendants also move for summary judgment as to MMI's claims for

fraud.  MMI contends that APS and Ryan made numerous misrepresentations, throughout the

purchase order relationship, regarding both the specific nature and origin of the product.

According to MMI, APS made such representations to keep MMI under the impression that it

was purchasing formulation 48 rather than FR-48.  Defendants, on the other hand, maintain that

MMI's claims fail on various elements of fraud.

> As the Ohio courts have held:
>
> Under Ohio law, to prevail on a fraudulent misrepresentation claim a plaintiff must prove: (1) a representation, or if a duty to disclose exists, concealment of a fact, (2) that is material to the transaction at issue, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent to mislead another into relying on it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance.

*Andrew v. Power Marketing Direct, Inc.*, 978 N.E.2d 974, 989 (Ohio Ct. App. 2012) (citing

*Burr v. Stark Cty. Bd. of Comm'r*, 23 Ohio St.3d 69, 73 (1986)).  Relatedly, under Ohio law, "[a]

claim for fraudulent inducement arises when a party is induced to enter into an agreement

through fraud or misrepresentation."  *Strategy Group for Media, Inc. v. Lowden*, No. 12 CAE 03

0016, 2013 WL 1343614, at *7 (Ohio Ct. App. Mar. 21, 2013).

"In proving a fraud claim, a person's intent to mislead another into relying on a

misrepresentation or concealment of a material fact generally must be inferred from the totality

of the circumstances since a person's intent is rarely provable by direct evidence."  *Aztec*

*Internatl. Foods, Inc. v. Duenas*, No. CA2012–01–002, 2013 WL 501734, at \*11 (Ohio Ct. App. Feb. 11, 2013). "The question of justifiable reliance is one of fact and requires an inquiry into the relationship between the parties." *Mar Jul, L.L.C. v. Hurst*, No. 12CA6, 2013 WL 557108, at \*13 (Ohio Ct. App. Feb. 6, 2013) (internal quotations omitted). "Reliance is justifiable if the representation does not appear unreasonable on its face and if there is no apparent reason to doubt the veracity of the representation under the circumstances." *Id.* (internal quotations omitted). Finally, "[i]n a fraud action, a plaintiff is entitled to recover as compensatory damages such damages as will fairly compensate him for the wrong suffered, that is, the damages sustained by reasons of the fraud or deceit and which have naturally and proximately resulted therefrom." *Danial v. Lancaster*, No. 92462, 2009 WL 2186762, at \*2 (Ohio Ct. App. July 23, 2009).

As with the breach of contract claims, the Court finds that neither side is entitled to summary judgment on MMI's fraud claim. Contrary to Defendants assertions, MMI presents sufficient evidence to raise issues of fact as to the elements of fraud. First, a reasonable jury could infer from the evidence that APS and Ryan made false representations leading up to—and during the course of—the purchase orders between MMI and APS.[20] J. Spencer testified that APS continuously made representations to MMI that the product MMI was purchasing was APS's formulation. (J. Spencer Dep. 79.) During the email exchanges between Ryan and J. Spencer, discussing the potential purchase order, Ryan continually labeled his emails as regarding "Formulation 48." (Dep. Ex. 16.) In confirming the initial October 2006 purchase

---

[20] The parties' briefing also discusses whether APS had any duty to disclose information to MMI. Because the Court finds that a reasonable jury could find that APS made affirmative misrepresentations, it is unnecessary to address this issue.

31

order, Ryan again labeled his email subject as "Formulation #48." (Dep. Ex. 48.) Additionally, APS sent MMI a MSDS listing "Formulation #48" as the identity of the product in question.[21] (Jones Dep. Ex. 68.) Moreover, during email exchanges following the initial purchase order, Ryan made several statements implying—when drawing reasonable inferences in MMI's favor—that APS was manufacturing the product at issue. (*See, e.g.*, Dep. Exs. 27, 30.) Despite these various representations and statements, it is undisputed that APS was selling MMI FR-48, a product that Spartan manufactured.

Second, a reasonable jury could find that APS and Ryan intended to mislead MMI and that MMI justifiably relied on the representations. The evidence demonstrates that APS was aware of the difference between formulation 48 and FR-48. (*See, e.g.*, Thottathil Dep. 21.) In contrast, many of the emails J. Spencer sent to Ryan suggest that MMI thought it was purchasing a formulation. (*See* Dep. Ex. 16.) Furthermore, the record reflects that APS took numerous steps to conceal the fact that Spartan, and not APS, was manufacturing and shipping the product.[22] Considering this and other record evidence, MMI has presented sufficient evidence to establish a genuine dispute as to Defendants' intent. Moreover, with regard to reliance, much of the evidence concerning the parties' relationship indicates that MMI was justified in relying on APS's representations as to the product MMI was purchasing. For example, J. Spencer testified

---

[21] The parties also dispute whether it was proper—in light of the requirements of the Occupational Health and Safety Act—for APS to list itself as manufacturer on the relevant MSDS. The Court finds it unnecessary to address the issue at least for the purposes of summary judgment.

[22] The Court does not go as far as to find that APS's efforts to protect its role as a distributor were, in and of themselves, sufficient to constitute fraud. Nevertheless, when viewed in combination with other circumstances, such activities support the inference that APS was actively misleading MMI as to the product MMI was purchasing.

that MMI did not have the capability of testing the chemistry of the products APS provided.  (J.

Spencer Dep. 46–47, 142.)  Under such circumstances, a jury could find that MMI reasonably

relied on APS—the company MMI had contracted with for research and development—to

accurately represent the nature of the product APS was supplying.

MMI also provides sufficient evidence to survive summary judgment on the remaining

elements of fraud.  It is readily apparent that the identity of the product was material to the

purchase order transactions.  Finally, following the reasoning outlined in considering breach of

contract, a trier of fact could reasonably infer that the purported misrepresentations caused MMI

damages.  Specifically, the evidence reflects that MMI purchased FR-48 from APS at a marked-

up rate, for an extended period, when other comparable products were available.

Nevertheless, the record also contains conflicting evidence that would allow a trier of fact

to find for Defendants.  At the very least, a genuine dispute remains regarding Defendants' intent.

Although a jury could find intent to mislead, a jury could also reasonably view the

communications as simply containing imprecise language during informal communications.

Given the similarity of the product names in this case, which appears to be coincidental, such

confusion would be understandable.  Additionally, crediting Defendants' evidence and

testimony, APS informed MMI that the product was not formulation 48, but instead an additive

from Spartan.  (*See* Dep. Ex. 12; Ryan Dep. 128–29, 170.)  In addition to cutting against any

malicious or reckless intent, such evidence also supports an inference that any reliance on

contrary representations was not reasonable.

**D.    The Ohio Deceptive Trade Practices Act**

Defendants and MMI each move for summary judgment as to MMI's claims pursuant to

33

the ODTPA. MMI maintains that Defendants (1) passed off Spartan's product as their own,

(2) caused a misunderstanding as to the source of the product in question, and (3) misrepresented

that the product MMI was purchasing was of a particular quality. Defendants, however, maintain

that the ODTPA claims fails because there was no misrepresentation and MMI cannot

demonstrate damages.[23]

The ODTPA states in relevant part:

(A)     A person engages in a deceptive trade practice when, in the course of the
        person's business, vocation, or occupation, the person does any of the
        following:

        (1)     Passes off goods or services as those of another;
        (2)     Causes likelihood of confusion or misunderstanding as to the source,
                sponsorship, approval, or certification of goods or services;
                                        * * *
        (9)     Represents that goods or services are of a particular standard, quality,
                or grade, or that goods are of a particular style or model, if they are of
                another . . . .

Ohio Rev. Code § 4165.02(A).

"When adjudicating claims arising under the Ohio Deceptive Trade Practices Act, Ohio

courts apply the same analysis applicable to claims commenced under analogous federal law."

*Corrova v. Tatman*, 164 Ohio App.3d 784, 788 (Ohio Ct. App. 2005). Notably, the Lanham

Act—the ODTPA's federal counterpart—recognizes a claim for the reverse passing off products.

*Clark v. Walt Disney Co.*, 642 F. Supp.2d 775, 785 (S.D. Ohio 2009). Such a claim occurs when

a "producer misrepresents someone else's goods or services as his own." *Dastar Corp. v.*

---

[23] Within a footnote of their Motion for Summary Judgment, Defendants also maintain
that MMI has no standing under the ODTPA because APS and MMI are not competitors. The
ODTPA, however, explicitly provides that a plaintiff "need not prove competition between the
parties to the civil action" to bring a claim under the Act. Ohio Rev. Code § 4165.02(B).

34

*Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 (2003).  In considering claims under the

ODTPA, the ultimate question is generally whether a defendants actions are likely to confuse

customers as to the "origin of the goods offered by the parties."  *See Bedford Auto Dealers Assn.*

*v. Mercedes Benz of N. Olmsted*, No. 97080, 2012 WL 760626, at *3 (Ohio Ct. App. 2012) ("In

every case, [t]he ultimate question remains whether relevant consumers are likely to believe that

the products or services offered by the parties are affiliated in some way."); *cf. also Kenneth J.*

*Majcen & Assoc. v. Phoenix Assoc., Inc.*, No. 76454, 2001 WL 60038, at *8 (Ohio Ct. App. Jan.

1, 2001) (noting that a single act of misleading a customer as to the source of goods "causes

sufficient likelihood of confusion or misunderstanding to constitute a deceptive trade practice").

Once again, summary judgment is not appropriate for either party.  Following the same

basic reasoning as applied to MMI's fraud claims above, a reasonable jury could find in favor of

either MMI or Defendants on the ODTPA claims.  Crediting MMI's evidence, and drawing

inferences in its favor, the trier of fact could conclude APS and Ryan made a series of

representations that lead MMI to reasonably believe that it was purchasing formulation 48, a

unique multi-ingredient formula that APS developed and manufactured, rather than FR-48, a

Spartan product and more basic compound.  On the other hand, crediting Defendants' evidence

and drawing inferences in their favor, a reasonable jury could determine that Defendants took

sufficient actions to inform MMI of the nature of the product in question, such that there would

be no confusion.  Furthermore, for reasons already addressed, a dispute remains as to MMI's

damages.  Under these circumstances, neither side is entitled to judgment.

**E.      Breach of Fiduciary Duty**

Defendants also move for summary judgment on MMI's claims for breach of fiduciary

duty.[24] MMI maintains that APS and Ryan owed MMI a fiduciary duty, which they violated by failing to disclose information and making false representations.  Defendants contend that MMI fails to establish the existence of a fiduciary duty.

"To prevail on a breach of fiduciary duty claim, a party must show the existence of a fiduciary relationship, failure to comply with a duty accorded that relationship, and damages proximately caused by that failure." *State ex rel. Atty. Gen. v. Vela*, — N.E.2d —, 2013 WL 1187839, at * 7 (Ohio Ct. App. Mar. 15, 2013).  "The Ohio Supreme Court has defined a 'fiduciary relationship' as one 'in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence, acquired by virtue of special trust.'" *L.F.P.IP, LLC v. Hustler Cincinnati, Inc.*, No. 1:09cv913, 2013 WL 27494, at *4 (S.D. Ohio Jan. 2, 2013) (quoting *Ed Schory & Sons, Inc. v. Soc. Nat'l Bank*, 75 Ohio St.3d 433, 442 (Ohio 1996)).  "[U]nder Ohio law, in the absence of special circumstances, no fiduciary relationship exists between parties negotiating an arm's-length commercial transaction." *Scotts Co. LLC v. Liberty Mut. Ins. Co.*, 606 F. Supp.2d 722, 739 (S.D. Ohio 2009).  "An ordinary business relationship cannot be turned into a fiduciary one absent factors of mutual knowledge of confidentiality or the undue exercise of power or influence." *AAA Installers v. Sears Holdings Corp.*, 764 F. Supp.2d 931, 940 (S.D. Ohio 2011) (internal quotations omitted).  Moreover, "[t]he fact that one party possesses more expertise concerning the matter under negotiation is insufficient in itself to establish a special relationship of trust." *Scotts*, 606 F. Supp.2d at 739.

---

[24] MMI does not move for summary judgment on its claims of breach of fiduciary duty and negligent misrepresentation.

Here, Defendants are entitled to summary judgment on MMI's claims for breach of fiduciary duty. Specifically, MMI fails to demonstrate that either APS or Ryan owed MMI a fiduciary duty. This case involves arms-length transactions between two business entities. Although APS may have had more expertise regarding the subject matter of the transactions, the Court finds this fact, in and of itself, insufficient to establish a fiduciary relationship. MMI contends, in an attempt to establish a fiduciary duty, that MMI supplied proprietary information. The current evidence, however, merely demonstrates that MMI gave APS samples of its mulch product—that it had already sold on the open market—for testing. (*See* Thottathil Dep. 8.) Under these circumstances, MMI has failed to sufficiently demonstrate the existence of a fiduciary relationship.

**F.     Negligent Misrepresentation**

MMI's final cause of action is for negligent misrepresentation.[25] Defendants move for judgment on this claim, contending that they have not breached any duty.

Ohio law recognizes a cause of action for negligent misrepresentation within a business transaction. *Carpenter v. Long*, 196 Ohio App.3d 376, 396 (Ohio Ct. App. 2011). As one Ohio court has described:

> "The elements of negligent misrepresentation are as follows: 'One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.'" *Delman v. Cleveland Hts.* (1989), 41 Ohio St.3d 1, 4, 534 N.E.2d 835. "A negligent misrepresentation occurs when one ' supplies false information for the guidance of others.' (Emphasis

---

[25] Although MMI labels its claim as one for simple negligence, its pleadings track the standards, under Ohio law, for negligent misrepresentation.

37

sic.) *[Textron Fin. Corp. v. Nationwide Mut. Ins. Co.* (1996), 115 Ohio App.3d 137, 149, 684 N.E.2d 1261.] In other words, a '[n]egligent misrepresentation does not lie for omissions; there must be some affirmative false statement. [123 Ohio App.3d 51, 702 N.E.2d 1246.]' " *Leal v. Holtvogt* (1998), 123 Ohio App.3d 51, 62, 702 N.E.2d 1246.

*Id.*

In this case, MMI presents sufficient facts to create a genuine dispute of fact regarding negligent misrepresentation. For the reasons described above, a reasonable jury could find that APS and Ryan made false representations both leading up to—and during the course of—the purchase order relationship. Even assuming the jury fails to find fraudulent intent, the jury could still conclude—based on the current record—that APS and Ryan did not exercise sufficient care in communicating to MMI regarding the nature of the product. Once again, the evidence reflects that APS was aware of the difference between formulation 48 and FR-48. (*See, e.g.*, Thottathil Dep. 21.) Given the similar names of the two products, and the fact that APS was frequently supplying MMI with information regarding the purchase order, it would be reasonable to conclude that APS and Ryan should have been more careful in communicating with MMI. In light of these circumstances, summary judgment is inappropriate.

## G.    Individual Claims Against Ryan

Finally, the parties dispute whether MMI's individual claims against Ryan should survive summary judgment. Ryan specifically contends that (1) he was not a party to any of the contracts between APS and MMI, and (2) he is protected by APS's corporate structure.

To the extent MMI attempts to raise breach of contract claims against Ryan, the Court

dismisses such claims.[26]  "Generally, corporate officers are not individually liable on a breach of

contract claim unless they personally signed the contract in their individual capacity." *Ayad v.

Radio One, Inc.*, No. 88031, 2007 WL 1501748, at *8 (Ohio Ct. App. May 24, 2007).  In this

case, Ryan—individually—was not a party to the transactions between APS and MMI, as he

signed the Agreement in his capacity as CEO.  (Agreement III.)  Consequently, he may not be

held liable for breach of contract in his individual capacity.  MMI cites authority suggesting that

Ryan may still be held liable for his personal interference with the contracts in question.  MMI,

however, failed to raise any interference with contract claims within its Complaint.[27]

Nevertheless, Ryan may be held individually liable—based on his personal conduct—for

MMI's claims of fraud, negligent misrepresentation, and violations of the ODTPA.  Under Ohio

law, "a corporate officer can be held personally liable for tortious acts he or she has committed

and, under such circumstances, a plaintiff need not pierce the corporate veil to hold individuals

liable who have personally committed such acts." *Roberts v. RMB Ents., Inc.*, 197 Ohio App.3d

435, 449 (Ohio Ct. App. 2011); *cf. also Simmons v. Cook*, 701 F. Supp.2d 965, 989 (S.D. Ohio

2010) ("Corporate officers may be held personally liable for Lanham Act violations.").  Here, the

evidence reflects that Ryan was prominently involved in the conduct giving rise to MMI's

claims, as APS generally communicated to MMI through Ryan.  Moreover, for the reasons

outlined above, MMI presents sufficient evidence to survive summary judgment on these

remaining claims.

---

[26] MMI does not individually name Ryan within its breach of contract pleading.  (Compl.
¶¶ 36–41, ECF No. 1.)

[27] MMI also provides no basis for piercing APS's corporate veil.

39

## IV.  CONCLUSION

For the foregoing reasons, APS's Motion for Summary Judgment (ECF No. 46) is

**GRANTED** in part and **DENIED** in part, and MMI's Motion for Partial Summary Judgment is

**DENIED**.  (ECF No. 47).

**IT IS SO ORDERED.**


_____5 - 23 - 2013_____
**DATE**

_____
EDMUND A. SARGUS, JR.
**UNITED STATES DISTRICT JUDGE**